MAXWELL, J.,
for the Court:
¶ 1. Mona Cates and Elizabeth Swain were involved in an intimate relationship with one another and cohabited for over five years in three different states. After Swain moved out of Cates’s Tate County, *1075 Mississippi, home, Swain sued Cates seeking various equitable remedies.
¶ 2. We affirm the chancellor’s denial of Swain’s claim that, based on their living arrangement, Swain was entitled to an interest in Cates’s house through a constructive and/or resulting trust. But we hold the chancellor exceeded his discretion in finding Cates had been unjustly enriched by Swain’s financial contributions during their cohabitation. An action for unjust enrichment is based on an implied contract. And the Mississippi Supreme Court has refused to circumvent the Mississippi Legislature’s abolishment of common law marriage by extending implied contractual remedies to unmarried cohabitants. Similarly, this court is restrained from delving into policy issues of this nature and extending implied contractual remedies to unmarried cohabitants, whether opposite-sex or same-sex, when there is no express agreement for remuneration beyond cohabitation. We, therefore, reverse the $44,995 unjust-enrichment award and render judgment in Cates’s favor.
FACTS AND PROCEDURAL HISTORY
¶ 3. Cates is a commercial pilot, and Swain, until her 2005 retirement, was a meteorologist and oceanographer for the Navy. In 2000, while living in separate states, they met online through a website for people seeking same-sex partners. Swain stated in her profile that she was single. But Cates later learned Swain was married and her estranged husband lived in another state. At trial, Swain admitted her marital status entitled her husband to coverage under her medical insurance policy. By being married, Swain also benefit-ted by claiming a greater housing allowance from the Navy. Swain did not divorce her husband until after she retired and ended her relationship with Cates.
I. Florida Home
¶ 4. At the end of 2000, Swain transferred to Pensacola, Florida. Swain bought a house in Pensacola and titled it in her name solely, though she was required to list her husband on her mortgage. Cates provided $2,500 in earnest money. And Swain paid the mortgage, significantly paying down the principal. Cates lived with Swain and traveled for work. Both women made improvements to the home. They opened a joint checking account, but Swain testified only Cates made financial contributions. Cates also paid $11,000 to trade in Swain’s Toyota SUV for a Mercedes. They also purchased other vehicles jointly titled in both of their names.
¶ 5. When asked at trial why they set up joint accounts, Swain testified because “we trusted each other. We had a mutual relationship that we were investing together in.” After the September 11, 2001 terrorist attacks, Cates set up an E-trade investment account in both of their names as a joint tenancy with right of survivor-ship. Cates testified she was concerned as a commercial pilot that something might happen to her and wanted Swain to have access to the money.
¶ 6. In 2003, Swain transferred to Seattle, Washington. She sold the Florida home and received approximately $32,000 in equity.
II. Washington Home
¶ 7. Cates, who flew to Seattle for work, moved to Washington with Swain. Cates purchased a home in Washington for approximately $200,000. Swain gave Cates a check for $34,000 representing the equity from the Florida home plus additional money from their joint Florida account. Cates testified this was a loan repayment for the more than $34,000 Cates had given Swain during their time in Florida — an *1076 assertion the chancellor found unsupported. Cates purchased the house in her name only. Swain testified she did not want her name on the title because she was still married and “wasn’t going to take that chance.” Swain lived in the Washington home without paying rent or mortgage payments but testified she made various improvements to the house. After two years, Cates sold the Washington house for $300,000.
III. Mississippi Home
¶ 8. In 2005, the two returned to Cates’s native Mississippi where Cates purchased a home in Tate County for $350,000. While Cates involved Swain in selecting a home, Cates bought the house in her name only. But Swain provided a check for $5,000, with “closing costs” written in the memo line. Swain also paid $4,449 to carpet the home.
¶ 9. After moving to Mississippi, the women’s relationship deteriorated. Swain ultimately moved out of the Mississippi house in March 2006. Immediately after, Swain attempted to liquidate the E-trade account. Cates learned of the stock sale and directed E-trade to deposit the proceeds in her own bank account. When asked why she tried to withdraw money from the account, Swain testified it was “because I ended up with absolutely nothing financially from what I had invested, and so honestly, I was trying to get something back.”
IV. Lawsuit
¶ 10. In June 2006, Swain sued Cates in the Tate County Chancery Court. Swain alleged she and Cates “were cohabitants prior to and at the time of delivery of the [Mississippi home] deed” and they “were partners and were in several joint ventures together.” She also alleged they had “entered into an agreement by and between themselves that [Swain] would invest the proceeds from her sale of her real property in the state of Florida towards future purchases of real property in the states of both Washington and Mississippi in order to provide both [Swain] and [Cates] with a residence.” Swain requested the court declare a constructive and/or resulting trust exists in the Mississippi home and that Swain be reimbursed for her investments in both the Washington and Mississippi houses.
¶ 11. Cates moved to dismiss the complaint, arguing the requested relief “violates the Mississippi Constitution’s prohibition against homosexual marriage.” The chancellor denied the motion. He found, while the Mississippi Constitution only recognizes marriage between a man and woman, the issues before him concerned a constructive and/or resulting trust and unjust enrichment.
¶ 12. The Mississippi Supreme Court denied Cates’s request for an interlocutory appeal, and the case proceeded to trial. The chancellor found Cates and Swain were in a confidential relationship but Cates had not abused that confidence. Thus, he denied a constructive trust. The chancellor also held insufficient evidence of a resulting trust existed because there was no evidence title to the Florida, Washington, or Mississippi properties was to be held by Cates for Swain’s benefit. So he rejected Swain’s request that Cates be divested of a portion of her interest in the Mississippi home.
¶ 13. But the chancellor found Cates had been unjustly enriched. He found, based on their living arrangements in Florida and Washington, Swain was entitled to recoup her equity in the Florida home, which she had given to Cates. The chancellor awarded Swain $38,000, less the $2,500 Cates paid as earnest money on the *1077 Florida home.[1] The chancellor also found “the payment of $5,000 for the closing of the Tate County, Mississippi, property [fell] into this same category” because this money was “clearly not an inter vivos” gift but was instead made with “some reasonable expectation of some return by repayment or otherwise.” The chancellor credited neither party for improvements they made to each other’s home because both enjoyed the use of the others’ properties for extended periods of time. The one exception was the $4,449 in carpeting in the Mississippi home because “Swain was able to reap the benefits of that contribution for only a very short period of time before leaving the residence with the full blessing and prodding of Cates only three months after its installation[.]” In total, the chancellor awarded Swain a judgment of $44,995[2] to be paid by Cates in cash.
ISSUES ON APPEAL
¶ 14. Cates appeals the judgment against her, arguing the $44,995 award is nothing more than “monetary relief from the dissolution of [the couple’s] five year lesbian relationship.” She claims the relief granted violates Mississippi’s public policy and asks that this court reverse the award and render judgment in her favor.
¶ 15. Swain cross-appeals and seeks de novo review of the chancellor’s denial of a constructive and/or resulting trust. She claims an equitable division of this trust entitles her to “a minimum sum of $76,755.56” plus attorney’s fees — which is equivalent to 22% interest in the Mississippi property. Alternatively, Swain argues the chancellor’s unjust enrichment award should be affirmed.
DISCUSSION
¶ 16. Cates and Swain take opposite approaches on the effect of their same-sex relationship and cohabitation on Swain’s equitable claims. Swain suggests the nature of their relationship is irrelevant, while Cates argues it precludes Swain from equitable recovery because Swain’s claims are marriage-based remedies in disguise.
I. Nature of Cates and Swain’s Relationship
¶ 17. Though Swain alleged her living arrangement with Cates was a “joint venture,” the chancellor found no business partnership existed. See Hults v. Tillman, 480 So.2d 1134, 1142 (Miss.1985) (“broadly defining] a joint venture as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, efforts, skill and knowledge”); see also Miss.Code Ann. § 79-13-202(a) (Rev. 2009) (“[A] business for profit forms a partnership[.]”); Miss.Code Ann. § 79-13-202(c)(1) (Rev. 2009) (Common ownership of property “does not of itself establish a partnership^]”). We likewise find no evidence in the record to support Swain’s theory that the two entered a business enterprise for profit.
¶ 18. Both women admit their relationship was personal and intimate. During the course of their relationship the women cohabited, and both wrote large checks to the other, and improved each other’s property. They jointly titled some assets, such as vehicles and checking and investment accounts, while intentionally buying homes individually. In their various financial interactions, they never formalized any loans to each other or agreements to share an *1078 interest in property not jointly titled. And they did not enter into any contractual agreements concerning their property should they separate. Cf. Estate of Reaves v. Owen, 744 So.2d 799, 802 (¶ 11) (Miss.Ct.App.1999) (finding a contract between same-sex partners who were dissolving relationship to be valid and enforceable). In Swain’s own words, they simply “trusted each other.”
¶ 19. The transcript from Swain’s chancery action reads similarly to a divorce trial. Much emphasis was placed on how the couple met, who paid for what during the course of their relationship, and what happened, in the words of Swain’s attorney, “after their separation.” But this trial had a prominent distinction — Cates and Swain were not married. Nor could they have been lawfully married under Mississippi law. When they met and throughout their entire relationship, Swain was already married to a man in West Virginia. And even had she divorced sooner, Swain could not have entered into a marriage with Cates that would be recognized under Mississippi law. See Miss. Const, art. 14 § 263A; Miss.Code Ann. § 93-1-1(2) (Rev. 2004). With no contractual or marriage-based remedies available to her, Swain bases her claim on the equitable principles of implied trusts and unjust enrichment.
II. No Implied Contracts Between Unmarried Cohabitants
¶20. Mississippi does not enforce contracts implied from the relationship of unmarried cohabitants. In Davis v. Davis, 643 So.2d 931, 934-35 (Miss.1994), the Mississippi Supreme Court addressed a claim by unmarried cohabitant, Elvis Davis, that she was entitled to equitable distribution of property her boyfriend had acquired while they lived together. Relying on Estate of Alexander, 445 So.2d 836, 840 (Miss.1984), the supreme court acknowledged any rights of a cohabitant would have to be provided by the Legislature — and the Legislature had clearly abolished common law marriage rights in 1956. Davis, 643 So.2d at 934-35 (citing Miss.Code Ann. § 93-1-15(1) (1972)). In denying Elvis Davis equitable distribution, the supreme court reiterated its earlier position in Estate of Alexander:
We are of the opinion that public policy questions of such magnitude are best left to the legislative process, which is better equipped to resolve the questions which inevitably will arise as unmarried cohabitation becomes an established feature of our society. While the judicial branch is not without power to fashion remedies in this area, we are unwilling to extend equitable principles to the extent plaintiff would have us to do, since recovery based on principles of contracts implied in law essentially would resurrect the old common-law marriage doctrine which was specifically abolished by the Legislature.
Davis, 643 So.2d at 934-35 (quoting Estate of Alexander, 445 So.2d at 839) (emphasis added).
¶ 21. Prior to the supreme court’s 1984 decision in Estate of Alexander, Mississippi had not addressed the equitable rights of unmarried cohabitants, though the Court had previously considered the equitable rights of “putative wives” — women who had ceremonially married but did not, in fact, have a legally valid marriage. See Chrismond v. Chrismond, 211 Miss. 746, 52 So.2d 624 (1951) and Taylor v. Taylor, 317 So.2d 422 (Miss.1975). In Estate of Alexander, the supreme acknowledged the “putative spouse” line of cases but found them “factually quite dissimilar and thus not controlling” where there “was not even any attempted legal ceremonial marriage but a mere ‘live-in’ relationship[.]” Estate of Alexander, 445 So.2d at 839. Our su *1079 preme court evaluated a variety of approaches from other states, including Georgia[3] and Illinois,[4] which rejected claims that unmarried cohabitants were entitled to equitable relief to recover for property accumulated during their cohabitation. The supreme court also closely examined, but declined to follow California’s approach, which directed, in the absence of an express contract, that its courts look to the cohabitants’ conduct to determine whether the conduct demonstrates an implied contract, partnership, joint venture, or other tacit understanding. Estate of Alexander, 445 So.2d at 838 (discussing Marvin v. Marvin, 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106, 110 (1976)). Ultimately, Mississippi opted for what it deemed “the logical view ... [as] stated by a Michigan court” — that public policy questions of this stature should be left to the legislative process, and the judicial branch should avoid fashioning implied contractual remedies that would essentially resurrect common-law marriage, which had been abolished by the Legislature. Id. at 839 (citing Carnes v. Sheldon, 109 Mich.App. 204, 311 N.W.2d 747, 753 (1981)).[5]
¶ 22. Based on the principle established in Estate of Alexander and Davis, we find public policy questions concerning same-sex cohabitants’ rights, just as with opposite-sex cohabitants rights, “are best left to the legislative process.” Davis, 643 So.2d at 934. We note the Mississippi Legislature in 1997 declared no marriage rights exist in Mississippi between same-sex partners, even those with valid marriages in other jurisdictions. Miss.Code Ann. § 93-1-1(2). And in 2004, House Concurrent Resolution 56 proposed to amend Mississippi’s constitution by creating a new section on marriage.[6] On November 2, 2004, Mississippi voters ratified Section 236A. Under this constitutional amendment:
Marriage may take place and may be valid under the laws of this state only between a man and a woman. A marriage in another state or foreign jurisdiction between persons of the same gender, regardless of when the marriage took place, may not be recognized in this state and is void and unenforceable under the laws of this state.
Miss. Const. art. 14, § 263A.
¶ 23. Because the issue of same-sex marriage has been addressed by the legislative process, we find we must yield to the supreme court’s admonition against judicially creating equitable remedies that undermine these policy decisions — particularly when this policy has been written into Mississippi’s constitution. Thus, we hold we cannot extend implied contractual remedies to unmarried cohabitants, whether opposite-sex or same sex — especially here, where the chancellor found no express agreement beyond mere cohabitation that would support Swain’s claim that she be repaid for financial contributions she made during their relationship. Furthermore, Swain was married to another man and could not validly marry Cates even in a *1080 jurisdiction that recognizes same-sex marriage. Therefore, the limited putative spouse doctrine is inapplicable.
¶ 24. While chancellors typically enjoy discretion in determining equitable remedies in non-domestic matters, the supreme court has held it is outside the chancellor’s discretion to fashion an equitable remedy for an unmarried cohabitant “based on principles of contracts implied in law.” Estate of Alexander, 445 So.2d at 839. But see Estate of Reaves, 744 So.2d at 802 (¶ 11) (finding Mississippi’s public policy against same-sex marriage does not prohibit same-sex partners from entering valid express contracts with each other).
¶ 25. “Unjust enrichment” is “modern designation for the doctrine of ‘quasi-contracts[.]’ ” Koval v. Koval, 576 So.2d 134, 137 (Miss.1991) (quoting Magnolia Fed. Savings & Loan v. Randal Craft Realty, 342 So.2d 1308, 1311 (Miss.1977)). “[T]he basis for an action for ‘unjust enrichment’ lies in a promise, which is implied in law, that one will pay to the person entitled thereto which in equity and good conscience is his.” Id. “It is an obligation created by law in the absence of any agreement; therefore, it is an implied in law contract.” 1704 21st Ave., Ltd. v. City of Gulfport, 988 So.2d 412, 416 (¶ 10) (Miss.Ct.App.2008) (citing Koval v. Koval, 576 So.2d 134, 137 (Miss.1991)) (emphasis added).
¶ 26. By holding Cates was unjustly enriched through her cohabitation with Swain, the chancellor essentially found an implied contract that Swain would be remunerated for her financial contributions to Cates. Estate of Alexander and Davis restrict such an implied contract arising between unmarried cohabitants. Swain testified to the financial benefits and obligations arising out of her marriage to her estranged husband. Thus, it was reasonable for her to understand similar rights did not arise from her relationship with Cates. As in Estate of Alexander, Swain’s financial contributions to the homes in which she cohabited, rent free, with Cates must be viewed as given gratuitously without expectation of repayment, absent evidence of an express agreement between the two. See Estate of Alexander, 445 So.2d at 840. In the instructive words of supreme court in Estate of Alexander, “[a] deed or contract would also have sufficed.” Id.; see Estate of Reaves, 744 So.2d at 802 (¶ 11).
¶ 27. The chancellor made no finding of any express agreement, but instead found Swain’s expectation of repayment was implied based on the women’s cohabitation arrangements. The supreme court has been explicit that cohabitation alone cannot form the basis of an equitable remedy between non-married eohabitants. Because we find the chancellor’s unjust enrichment remedy was outside the bounds of a chancery court’s equitable powers regarding such cohabitants, we must reverse the award of $44,995 and render judgment in Cates’s favor.
¶ 28. With respect to Chief Judge Lee’s dissent, we find he treads on policy issues that the supreme court has emphasized are “best left to the legislative process.”[7] We note the dissent does not contest the majority’s holding that Mississippi law precludes fashioning an unjust enrichment award under these facts. Instead, the dissent would craft an alternate remedy based on the chancellor’s power to grant equitable division under the “putative spouse doctrine,” first expressed in Chrismond, 211 Miss. at 757, 52 So.2d at 629.[8]
¶ 29. In addition to the supreme court’s stance against delving into this policy is *1081 sue, we find the cases the dissent cites inapplicable. The supreme court has held the equity power in Chrismond does not extend to cohabitants, like Swain and Cates, who never attempted a valid marriage. Davis, 643 So.2d at 935-936; Estate of Alexander, 445 So.2d at 839. “Such a remedy is only available where ‘the couples had either been married or contended to have married.’” Cotton v. Cotton, 44 So.3d 371, 374 (¶ 6) (Miss.Ct.App.2010) (quoting Nichols v. Funderburk, 883 So.2d 554, 558 (¶ 11) (Miss.2004)). Here, both women testified they were never married in another state, nor did they contend to be married. And had they attempted to marry in Mississippi, they could not lawfully have done so. Therefore, the chancellor lacked authority to grant Swain an equitable distribution under the narrow putative-spouse doctrine. Id.
III. No Evidence Supporting an Implied Trust
¶ 30. We also affirm the chancellor’s holding that no implied trust arose in Swain’s favor. The existence of a constructive or resulting trust is a question of law, which we review de novo. Van Cleave v. Estate of Fairchild, 950 So.2d 1047, 1051 (¶ 12) (Miss.Ct.App.2007) (citing Allred v. Fairchild, 785 So.2d 1064, 1068 (¶ 7) (Miss.2001)). “Clear and convincing proof is necessary to establish a resulting or constructive trust.” Nichols v. Funderburk, 881 So.2d 266, 273 (¶ 29) (Miss.Ct.App.2003) (citing Allgood v. Allgood, 473 So.2d 416, 421 (Miss.1985)).
1. Constructive Trust
¶ 31. A constructive trust “is designed to prevent fraud, overreaching, or other wrongful act by which one person has obtained legal title to property rightfully belonging to another.” Simmons v. Simmons, 724 So.2d 1054, 1057 (¶ 7) (Miss.Ct.App.1998) (citing George Gleason Bogert, The Law of Trusts and Trustees § 451 (2d ed. rev. 1991)). It is “a means by which one who unfairly holds a property interest may be compelled to convey that interest to another to whom it justly belongs.” In re Estate of Hood, 955 So.2d 943, 949 (¶ 21) (Miss.Ct.App.2007) (citing In re Estate of Horrigan, 757 So.2d 165, 170 (¶ 25) (Miss.1999)).
¶32. “A constructive trust: ‘arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, to hold and enjoy.’” Id. (quoting Sojourner v. Sojourner, 247 Miss. 342, 353, 153 So.2d 803, 807 (1963)). There are two relevant intertwined considerations. “It is the relationship [whether fiduciary, moral, social, domestic, or personal] plus the abuse of confidence that authorizes a court of equity to construct a trust for the benefit of the party whose confidence has been abused.” Id. (quoting Thornhill v. Thornhill, 905 So.2d 747, 753 (¶ 18) (Miss.Ct.App.2004)).
¶ 33. The chancellor deemed the evidence insufficient to impose a constructive trust. Though he found Cates and Swain were in a confidential relationship, he *1082 found no abuse of that confidence by Cates. We too find no evidence, let alone clear and convincing evidence, that Cates abused her relationship with Swain to obtain title to the Washington or Mississippi homes. See Estate of Hood, 955 So.2d at 949 (¶ 22) (finding no constructive trust because, though the parties did not dispute a confidential relationship existed between a deceased homeowner and his neighbors, no abuse of confidence led to the homeowner conveying his home to this neighbors).
¶ 34. We have previously addressed constructive trusts in terms of a promise made with no intention to perform it. Nichols, 881 So.2d at 273 (¶ 29). In Nichols, a long-term, live-in girlfriend argued her boyfriend held his business and personal properties in constructive trust because “she worked and contributed to all of the businesses and the home....” Id. at 272 (¶ 28). But this court found the boyfriend had never promised his girlfriend to convey any interest in his businesses or personal properties in exchange for her efforts. Id. at 273 (¶ 30). Thus, she was “not now entitled to division of the property under this theory.” Id.
¶ 35. Swain argues she trusted Cates and their relationship, investing money and “sweat equity” in the Washington and Florida homes. But as in Nichols, there is no record evidence that Cates promised to convey Swain an interest in the Washington or Mississippi properties in exchange for her financial contributions and improvements. The record instead shows Swain invested in Cates’s properties based on their long-term personal relationship. And there is no evidence Cates abused that relationship. See In re Estate of Parker, 13 So.3d 877, 880 (¶ 8) (Miss.Ct.App.2009) (finding no proof of the existence of a constructive trust on live-in girlfriend’s home because no evidence of dominant influence by girlfriend over live-in boyfriend). Swain argues the abuse lay in Cates’s keeping the property after they broke up. But a constructive-trust analysis focuses on the acquisition of property and whether it was obtained through fraud or abuse of a confidential relationship. Simmons, 724 So.2d at 1057 (¶ 7).
¶ 36. Further, Cates testified Swain did not desire to own the properties because she was still married to her husband and “didn’t want to take that chance,” presumably that her husband might receive a portion of any interest she may have obtained. We find equity does not demand Swain receive an interest in property she intentionally did not acquire because of her estranged husband. We find no error in the chancellor’s denial of a constructive trust.
2. Resulting Trust
¶ 37. “[A] resulting trust arises in a transaction when one person is granted a legal title but is required to hold this title for the benefit of another.” In re Estates of Gates, 876 So.2d 1059, 1064 (¶ 17) (Miss.Ct.App.2004). “[Wlhere one buys an asset in the name of another, the asset will be deemed held by the record owner in a resulting trust for the benefit of the person actually advancing the purchase money.” Simmons, 724 So.2d at 1058 (¶ 10) (citing Brabham v. Brabham, 226 Miss. 165, 172, 84 So.2d 147, 151 (1955)).
¶ 38. The chancellor found insufficient evidence of a resulting trust because he “[could not] say that title to [the Florida, Washington, or Mississippi] properties was to be held by one for the benefit of the other.” Our de novo review leads us to the same conclusion. While Swain testified she did not want to title another home in her name because of her husband, the evidence is certainly not clear and convincing that Swain actually purchased the Washington or Mississippi home in *1083 Cates’s name. Thus, we also affirm the denial of a resulting trust.
¶ 39. THE JUDGMENT OF THE TATE COUNTY CHANCERY COURT IS AFFIRMED ON CROSS-APPEAL AND REVERSED AND RENDERED ON DIRECT APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE/CROSS-APPEL-LANT.
GRIFFIS, P.J., BARNES, ROBERTS, CARLTON AND FAIR, JJ., CONCUR. IRVING, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. RUSSELL, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY IRVING, P.J.; ISHEE, J., JOINS IN PART. LEE, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY ISHEE, J.

. These are the figures from the chancellor’s final order, which Swain admits contains mathematical and scrivener’s errors.

. See note 1.

. Rehak v. Matthis, 239 Ga. 541, 238 S.E.2d 81, 82 (1977) (holding, because unmarried cohabitation constituted immoral consideration in an agreement to live together, the claimant was not entitled to her portion of purchase money interest in a house).

. Hewitt v. Hewitt, 77 Ill.2d 49, 31 Ill.Dec. 827, 394 N.E.2d 1204, 1208 (1979) (holding unmarried cohabitant’s claim to property accumulated during cohabitation violated Illinois’s public policy disfavoring property rights for knowingly unmarried cohabitants).

. Mississippi reaffirmed its adherence to Michigan's approach in 1994 in Davis. Davis, 643 So.2d at 934-35.

. Laws 2004, Ch. 620.

. Davis, 643 So.2d at 934.

. Chrismond held "the equity powers of the court are sufficient to protect the rights of the *1081 putative wife, where the supposed marriage which she entered into in good faith turns out to be void, and ... she is entitled to an equitable division of the property accumulated by their joint efforts during the time they lived together as man and wife." Chrismond, 211 Miss. at 757, 52 So.2d at 629 (emphasis added).